1

2

3

4               UNITED STATES DISTRICT COURT

5                  DISTRICT OF NEVADA

6   JAMES E. WISCHMEIER,                    3:13-cv-00504-HDM-WGC

7                             Plaintiff,    **REPORT & RECOMMENDATION OF**
                                            **U.S. MAGISTRATE JUDGE**
8        v.

9   CAROLYN W. COLVIN,
    Acting Commissioner of Social Security,
10
                              Defendant.
11

12          This Report and Recommendation is made to the Honorable Howard D. McKibben,

13   Senior United States District Judge. The action was referred to the undersigned Magistrate Judge

14   pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the

15   court is Plaintiff James E. Wischmeier's Motion for Reversal of the Commissioner's Decision.

16   (Doc. # 11.)[1] Defendant Commissioner filed a response (Doc. # 17) and Cross-Motion for

17   Summary Judgment (Doc. # 18).[2] After a thorough review, the court recommends that the

18   Commissioner's cross-motion be denied and that Plaintiff's motion be granted and that the matter

19   be remanded to the ALJ for the calculation and award of benefits.

20                              **I. BACKGROUND**

21          On December 30, 2008, Plaintiff filed an application for Disability Insurance Benefits

22   (DIB). (Administrative Record (AR) 238-239.) On January 24, 2009, Plaintiff filed an

23   application for Supplemental Security Income (SSI). (AR 240-242.) He alleged he became

24   disabled on June 1, 2008 due to bipolar affective disorder, posttraumatic stress disorder (PTSD),

25

26   _____

27          [1] Refers to court's docket number. Unless otherwise indicated, all page number references are to the court's
    docketed page numbers.
28
            [2] These two documents are identical.

myofascial joint pains with a history of back and knee pain, hallux limitus[3] right foot with degenerative joint disease, chronic cholecystitis[4] with cholelithiasis[5] status post laparoscopic cholecystectomy[6], sleep apnea and a history of headaches. (AR 238.) The Commissioner denied his application initially and on reconsideration. (AR 143-159.) Plaintiff made a timely request for a hearing before an Administrative Law Judge (ALJ) to challenge the Commissioner's determination. (AR 160-162.) The ALJ held an initial hearing on February 6, 2011, and Plaintiff appeared, represented by counsel, and testified. (AR 38-69.) The ALJ denied Plaintiff's application. (AR 123-141.) Plaintiff appealed, and the Appeals Council remanded the matter to the ALJ for consideration of additional issues. (AR 211-213.)

A second hearing was conducted by another ALJ on May 23, 2012. (AR 70-90.) Plaintiff appeared, represented by counsel, and testified at the hearing along with a vocational expert (VE). (AR 70-90.)

The ALJ followed the five-step sequential process for evaluating such claims, and issued a written decision on July 18, 2012, finding Plaintiff not disabled under the Social Security Act. (AR 18-37.) Plaintiff appealed and the Appeals Council denied review. (AR 1-7.) Thus, the ALJ's decision became the final decision of the Commissioner.

Plaintiff now appeals the ALJ's decision to the district court. (Doc. # 11.) He argues that the ALJ improperly rejected Plaintiff's credibility; ignored and improperly discredited the opinions of Plaintiff's treating psychiatrist, Susan Drymalski, M.D., as well as the supporting

---

[3] "Hallux rigidus is a disorder of the joint located at the base of the big toe. It causes pain and stiffness in the joint, and with time it gets increasingly harder to bend the toe. 'Hallux' refers to the big toe, while 'rigidus' indicates that the toe is rigid and cannot move. Hallux rigidus is actually a form of degenerative arthritis...In its earlier stage, when motion of the big toe is only somewhat limited, the condition is called 'hallux limitus.'" http://www.foothealthfacts.org/footankleinfo/hallux-rigidus.htm, last visited September 22, 2014 (identified as the official consumer website of the American College of Foot and Ankle Surgeons).

[4] "Chronic cholecystitis is swelling and irritation of the gallbladder that continues over time" usually caused by "gallstones in the gallbladder." http://www.nlm.nih.gov/medlineplus/ency/article/000217.htm, last visited September 22, 2014.

[5] This is the "production of gallstones." http://www.merriam-webster.com/dictionary/cholelithiasis, last visited September 22, 2014.

[6] This refers to removal of the gallbladder.
https://www.facs.org/~/media/files/education/patient%20ed/cholesys.ashx, last visited September 22, 2014 (from the American College of Surgeons).

1   findings of the Disability Determination Services' mental RFC assessment given by Susan

2   Kotler, Ph.D.; incorrectly discredited the testimony of Plaintiff's witnesses, Rita Lepine and

3   Shawn Wischmeier; gave an incomplete hypothetical to the VE by failing to include

4   Dr. Drymalski's limitations concerning his interaction with supervisors, co-workers and the

5   public and Dr. Drymalski's opinion that he would be absent three days a month; failed to

6   acknowledge the VE's testimony that if Plaintiff required accommodations under the Americans

7   with Disabilities Act (ADA), the jobs listed as available would in fact not be available to

8   Plaintiff; failed to acknowledge the VE testimony that neither of the jobs identified would be

9   available if the individual were significantly slower in pace than an average worker; and ignored

10   the VE's testimony that if Plaintiff had the mental impairments identified by Dr. Drymalski (and

11   supported by Dr. Kotler), the jobs identified would be very significantly reduced or eliminated.

12           Notably, Plaintiff's motion does not contain an argument or reference to Plaintiff's

13   asserted physical limitations, and in particular his back and knee pain. Instead, the focus of his

14   motion centers on his mental limitations. Plaintiff also does not raise any issue related to his

15   migraines (which the record reflects were alleviated by medication) or his foot or gallbladder

16   issues (which the record suggests were resolved with their respective surgeries). Therefore, in its

17   analysis the court will likewise focus on Plaintiff's mental limitations.

18           The Commissioner argues: the ALJ properly made an adverse credibility finding as to

19   Plaintiff because the objective medical evidence, as well as Plaintiff's failure to seek treatment,

20   conservative course of treatment, extensive activities of daily living, and the fact that he was able

21   to work with the same impairments he now alleges render him disabled, contradicted his claims

22   of disabling limitations; the ALJ properly weighed the findings of Dr. Drymalski by stating they

23   were contradicted by the medical evidence and impermissibly vague; the ALJ posed a complete

24   hypothetical to the VE because it contained all of the ALJ's findings; there was no evidence

25   Plaintiff had any work-related ADA accommodations; and the VE only testified that an ADA

26   accommodation requiring unscheduled breaks would prevent Plaintiff from performing any job.

27   ///

28   ///

## II. STANDARD OF REVIEW

The court must affirm the ALJ's determination if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec. Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

To determine whether substantial evidence exists, the court must look at the record as a whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

## III. DISABILITY AND THE FIVE-STEP SEQUENTIAL PROCESS

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if:

- 4 -

[H]is physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Garrison,* 759 F.3d at 1010 (citing *Ludwig v. Astrue,* 681 F.3d 1047, 1048 n. 1 (9th Cir. 2012)). If at any step the Social Security Administration (SSA) can make a finding of disability or nondisability, a determination will be made and the SSA will not further review the claim. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). "'The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five.'" *Garrison*, 759 F.3d at 1011 (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)).

In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or a combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*. Basic work activities are "the abilities and aptitudes necessary to do most jobs[,]" and include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual

work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521 and § 416.921. If a claimant's impairment is so slight that it causes no more than minimal functional limitations, the Commissioner will find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(ii). If, however, the Commissioner finds that the claimant's impairment is severe, the Commissioner proceeds to step three. *Id.*

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last fifteen years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(b)(1).

In making this determination, the Commissioner assesses the claimant's "residual functional capacity" (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of limitations, and medical reports, to determine what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and § 416.945(a)(3).

- 6 -

1    A claimant can return to previous work if he or she can perform the "actual functional

2    demands and job duties of a particular past relevant job" or "[t]he functional demands and job

3    duties of the [past] occupation as generally required by employers throughout the national

4    economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and

5    citation omitted).

6    If the claimant can still do past relevant work, then he or she is not disabled for purposes

7    of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally,

8    a claimant who is physically and mentally capable of performing past relevant work is not

9    disabled, whether or not he could actually obtain employment.").

10    If, however, the claimant cannot perform past relevant work, the burden shifts to the

11    Commissioner to establish at step five, considering the claimant's RFC, age, education and past

12    work experience, that the claimant can perform work available in the national economy. 20

13    C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144. The

14    Commissioner may meet this burden either through the testimony of a VE or by reference to the

15    Grids.[7] *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

16    If the ALJ relies on a vocational expert, he can call upon the VE to testify as to: "(1) what

17    jobs the claimant, given his or her [RFC], would be able to do; and (2) the availability of such

18    jobs in the national economy.'" *Garrison*, 795 F.3d at 1011 (quoting *Tackett v. Apfel*, 180 F.3d

19    1094, 1101 (9th Cir. 1999) (alteration original)). "The ALJ may pose hypothetical questions to

20    the expert that 'set out all of the claimant's impairments' for the VE's consideration." *Id*. (quoting

21    *Gamer v. Secretary of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)). "'The

22    ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the

23    medical record.'" *Id*. (quoting *Tackett*, 180 F.3d at 1101). "'The testimony of a [VE] is valuable

24    _____

25    [7] "The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist

26    in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin*., 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Commissioner may not rely solely on the Grids

27    unless they accurately and completely describe the claimant's abilities and limitations. *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985) (citation omitted). The ALJ must take the testimony of a vocational expert where the

28    claimant suffers from non-exertional limitations that are "sufficiently severe so as to significantly limit the range of work permitted by his exertional limitation." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (internal quotation marks and citation omitted).

only to the extent that it is supported by medical evidence' and has 'no evidentiary value if the assumptions in the hypothetical are not supported by the record.'" *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989)).

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

## IV. DISCUSSION

### A. Plaintiff's Mental Impairments

Plaintiff treated with various mental health providers through the VA and the medical records submitted in support of his claim are extensive. The court will now provide a review of Plaintiff's mental health records.

### 1. August 2006-April 2009

In August 2006, Plaintiff complained of nightmares, waking up frequently at night, and of auditory hallucinations. (AR 844.) Otherwise, he described his mood as "okay." (AR 844.) He received a prescription for mood stabilization. (AR 845.) The following month, he described experiencing financial stressors which caused agitation and was prescribed additional medications for mood stabilization and severe agitation. (AR 814-815.) In October 2006, he reported feeling overwhelmed and suicidal. (AR 738.) He experienced nightmares and agitation and was worried about his finances. (AR 739.) He had thought about overdosing, but did not follow through. (AR 739.) Psychiatric admission was considered, but ultimately determined not to be indicated because Plaintiff's suicidal ideation was gone and his agitation had decreased. (AR 740.) In November 2006, he reported being depressed and having nightmares. (AR 735-736.) While he was described as polite and cooperative, he also had mild psychomotor agitation and was instructed to take medications for severe agitation, mood stabilization and for improvement of sleep and nightmares. (AR 736.) Later that month, he stated he was feeling more agitated, overwhelmed and anxious, with frequent nightmares. (AR 734.) His medications were

adjusted. (AR 736.) He was seen a few days later and appeared calm, but was a little depressed. (AR 727.) He reported two episodes of agitation, but he did not pose a physical threat to himself or others. (AR 727.) In December 2006, Plaintiff complained of having panic attacks once a week, and while his mood was stable he felt panicky, agitated and overwhelmed. (AR 725.) He did feel like he was sleeping better. (AR 725.) He was prescribed medication for agitation. (AR 725.)

In January 2007, Plaintiff reported that his sleeping medication caused him to sleep too much during the day, his mood was stable, was getting eight to nine hours of sleep and was still working. (AR 715.) He was polite and cooperative, but had mild psychomotor agitation, and was slightly anxious and restrictive. (AR 716.)

In April 2007, he complained of episodes of agitation, and reported stressors including moving into a new home and a change in his work schedule. (AR 699.) He reported being agitated one day where he started shouting and throwing things despite being compliant with his medications. (AR 699.) He was given additional medication for severe agitation. (AR 700.) Later that month, he made an urgent call to the VA, stating that he became very agitated and choked his wife. (AR 691.) She was uninjured; however, he was instructed to report to the VA emergency room immediately for admission. (AR 691.) He did not show up and a call was placed to his home, and Plaintiff's wife informed the VA that Plaintiff had taken a sleeping pill and that she did not feel threatened. (AR 691.) The VA checked in on him over the next several days and he was reported as calm with no further episodes of agitation. (AR 691-692.)

In May 2007, Plaintiff reported feeling "much better." (AR 688.) He also reported feeling "much better" in June 2007. (AR 680.) His mood was stable and he was "calm and focused." (AR 680-681.) This continued in August of 2007. (AR 649-652.)

In mid-October 2007, Plaintiff left a message for VA mental health stating that he was having a "nervous breakdown." (AR 634.) He reported that he "blew up" at his wife and she wanted him out. (AR 634.) He was instructed to go to the VA for stabilization, evaluation and possible admission. (AR 634.) He stated he had been compliant with his medications. (AR 634.) He indicated that he felt better the following day. (AR 634.)

He reported "feeling better" in November 2007, stating that his mood was "good," and he was sleeping well. (AR 617.)

In February 2008, he reported he was "doing well," as he was sleeping well and denied any manic episodes. (AR 594.)

In March 2008, Plaintiff's wife called the VA and left a message that Plaintiff was behaving aggressively. (AR 588.) She indicated he was not compliant with his medications. (AR 588.) Plaintiff was seen by the VA that day, and stated that he and his wife had been fighting and since he did not want to hurt her, he hits walls instead. (AR 586.) He thought his medication was not working as well as it had been before. (AR 586.) He was described as polite and cooperative, but had a "slightly blunted" affect. (AR587.) He was prescribed additional medication for mood stability. (AR 587.)

In April 2008, he reported he was "doing great." (AR 570.)

In May 2008, he called the VA and stated he recently had two "panic attacks" which resulted in his wife calling the police. (AR 568.) He reported that his thoughts had "increased" and he had been having some difficulty sleeping. (AR 568.) He denied suicidal or homicidal ideations. (AR 568.) His medications were adjusted for mood stability. (AR 568.) Later that month, his wife stated he was throwing temper tantrums, but Plaintiff indicated he was doing better with his mood swings since his medication dosage had been adjusted. (AR 568.)

On June 18, 2008, Plaintiff reported taking medication in a self-described suicide attempt and was admitted to the hospital. (AR 556.) Subsequent notes state that he and his wife denied a suicide attempt; however, the following day, he reported it as a suicide attempt again. (AR 556-557.) He was discharged once he was stabilized. (AR 557-558.) Later that month, he reported that his mood had been calm, but he had trouble sleeping. (AR 542.) He was described as polite and cooperative with clear speech and a fine mood. (AR 544.) He was given additional medication for insomnia. (AR 544.)

On July 3, 2008, Plaintiff presented to the VA emergency room and his wife asked that he be admitted. (AR 537, 540.) He stated he just wanted medication so he could go home and sleep. (AR 537.) His wife described him as being "out of control" all day, and stated that he had

"laid hands on two people" and "verbally abused" a fourteen year old girl, but he denied any altercations. (AR 537.) He was described as having "more problems with agitation." (AR 538.) He was not violent on examination and denied suicidal and homicidal ideations. (AR 539.) He was assessed with bipolar disorder with agitation. (AR 539.)

Plaintiff was admitted on July 10, 2008, and was assessed with an altered mental status, suicidal ideations and possible overdose. (AR 451, 483.) He was discharged on July 14, 2008. He complained of mood swings over a period of months, having a conflict with his wife, and stress from his job. (AR 484.) It was noted he had a suicide attempt three weeks earlier, although he denied trying to overdose. (AR 484, 487.) He had significant irritability even on his medications. (AR 484.) On the first day of admission, he was described as being generally isolative, only getting up for meals and medications. (AR 486.) He had a depressed mood and was withdrawn and isolated. (AR 437.) During his stay he had trouble sleeping, and his medications were adjusted which seemed to improve his sleep. (AR 455-56.) Upon discharge, he was stable and was prescribed medication for his insomnia. (AR 433-434, 445, 484.)

On July 21, 2008, Plaintiff reported a chief complaint of needing something in the daytime to help his mood. (AR 426.) He stated he was not getting along with his wife, but denied manic episodes. (AR 426.) He had been taking his medications. (AR 426.) Treatment goals included: trying to sleep without nightmares, preventing angry outbursts, and trying not to have self-mutilation or suicide attempts. (AR 427.) He was instructed to continue with his medications, including those for mood stabilization and insomnia. (AR 427.)

He failed to keep his scheduled appointments on July 24, 2008 and August 28, 2008 (AR 420, 423), and was next seen on October 2, 2008, when he reported he was separated from his wife. (AR 415.) He stated he was feeling good and was described as stable. (AR 416.) He failed to appear for his appointment with the clinical psychologist on October 16, 2008. (AR 412.)

On November 13, 2008, Plaintiff reported he was divorced for the second time in August 2008 from his wife (whom he had remarried). (AR 996.) He stated he was mentally stable at the time, but had trouble sleeping. (AR 997.) He denied symptoms of depression, mood swings,

irritability, anger, agitation, and anxious feelings. (AR 997.) He had an appropriate affect and mood. (AR 997.) He was coherent, reality-based and logical. (AR 997.) His medication was adjusted to help him sleep and for clearer thinking/mood. (AR 997.) A few days later, a provider noted he was cooperative but had a depressed mood and restricted affect. (AR 993.) His insight and judgment were noted as appearing somewhat limited. (AR 993.)

On December 10, 2008, Plaintiff stated that his mood was stable and he was sleeping nine hours per night. (AR 989.) He denied mood swings, irritability, anger, agitation and anxious feelings. (AR 989.)

On January 12, 2009, he reported that his mood was stable and he was sleeping ten hours a night. (AR 979.) He denied mood swings, irritability, anger, agitation or anxious feelings. (AR 979.) He told his provider: "I feel good; I'm happy." (AR 979.) Later that month, he reported that for two nights he had experienced nightmares about combat events which disrupted his ability to sleep. (AR 970-971.) It was noted that Plaintiff could be manifesting symptoms of PTSD. (AR 970.) His medication was adjusted and his nightmares were to be monitored. (AR 970.)

In February 2009, Plaintiff denied mood swings, irritability, anger, agitation and anxious feelings, but did report nightmares and poor sleep. (AR 960.) He was described as having a pleasant affect. (AR 960.) His medication was adjusted to help him sleep and he was prescribed additional medication to stabilize his sleep schedule. (AR 960.)

On March 9, 2009, Plaintiff said that he was seen the day before in triage for a manic episode, and had been given a medication which seemed to help. (AR 933.) He was described as "mildly anxious" at this time. (AR 933.) Plaintiff attended anger management classes in March and April 2009. (AR 917-921, 923, 926, 932.) He reported these were helping and his mood was noted as upbeat and positive. (AR 920.)

On April 8, 2009, Plaintiff reported a stable mood and sleep, he did not feel depressed, was not having mood swings or manic symptoms and his medication had helped to stabilize his mood. (AR 922.) He was sleeping eight hours a night and was described as pleasant. (AR 922.)

**2. April 3, 2009 Consultative Mental Status Examination with Dr. Lewis**

Plaintiff underwent a consultative mental status examination with Richard W. Lewis,

- 12 -

Ph.D., on April 3, 2009. (AR 1014-1018.) At the time of the examination, Plaintiff was thirty-three years old, and was separated from his wife. (AR 1014.) Dr. Lewis noted that Plaintiff did not renew his driver's license after it was suspended for not paying child support. (AR 1014.) He reported he last held a paying job in March 2008 for four months as a security officer, but was terminated when he went to jail because of a violation of a protective order involving the wife he was in the process of divorcing. (AR 1014.) He also worked at a warehouse, at a fast food restaurant, and held other security positions, with these jobs lasting on average three months until he was fired for not performing his job or yelling at his supervisors. (AR 1014.)

Dr. Lewis described Plaintiff as speaking in an abrupt manner with lack of any friendly animation. (AR 1015.) He was irritable and emotionally flat. (AR 1015.) He gave many reports involving supervisors trying to give him feedback and his becoming angry and getting fired. (AR 1015.) Dr. Lewis opined that Plaintiff has poor social skills and his manner would cause supervisors to quickly lose patience with him. (AR 1015.) Dr. Lewis stated that Plaintiff was not thought disordered or psychotic; however, he acted depressed given his irritability, flat affect and lack of smiles or sense of humor. (AR 1015.)

Dr. Lewis reviewed Plaintiff's mental health medications and Plaintiff stated they made him relaxed and calm and his mood was stable. (AR 1015.) While he still got irritable, he no longer would blow up. (AR 1015.) His last inpatient psychiatric hospitalization was in 2008. (AR 1015.) He was sleeping about ten hours a night plus three or four hour naps during the day. (AR 1016.) He stated that he was not aware of any feelings of depression or manic episodes. (AR 1016.) He occasionally thought he experienced hallucinations and was paranoid. (AR 1016.) He described a typical day as watching television, with no elaboration. (AR 1016.) He was able to take care of his basic needs, and got together with one friend for coffee and shopping. (AR 1016.)

Dr. Lewis opined that Plaintiff had sufficient cognitive ability to understand, remember and carry out uncomplicated but detailed and simple one- and two-step levels of instructions. (AR 1016.) With sufficient time, he could do so with some complex instructions. (AR 1016-17.) He had sufficient attention, concentration and short term recall if tasks were routine. (AR 1017.)

1    Plaintiff's irritability would impact his ability to interact appropriately with supervisors, co-

2    workers or the general public and he would not be successful working in employment settings

3    that require good social skills. (AR 1017.) Even with these limitations, Dr. Lewis opined Plaintiff

4    could work at tasks for at least short periods of time, and may be capable of working more

5    consistently if motivated to do so. (AR 1017.)

6            **3. April 9, 2009 Psychiatric Assessment by Dr. Kotler**

7            Dr. Kotler gave a psychiatric and mental RFC assessment and opined that Plaintiff had

8    moderate restrictions in activities of daily living, in maintaining social functioning and in

9    maintaining concentration, persistence or pace. (AR 1029.) She opined that while Plaintiff's

10   mental conditions could reasonably result in functional limitations, the alleged severity of the

11   functional impairment was not entirely consistent. (AR 1031.) She determined Plaintiff was

12   moderately limited in his ability to understand and remember detailed instructions. (AR 1033.)

13           He was also moderately limited in his ability to carry out detailed instructions, to

14   maintain attention and concentration for extended periods, and to work in coordination or

15   proximity to others without being distracted by them. (AR 1033.) He likewise had moderate

16   limitations in the ability to interact appropriately with the general public, to accept instructions

17   and respond appropriately to criticism from supervisors, to get along with coworkers or peers

18   without districting them or exhibiting behavioral extremes, and to respond appropriately to

19   changes in the work setting. (AR 1034.) She opined that Plaintiff could understand and

20   remember short, simple and detailed, but not complex instructions; could maintain attention and

21   concentration for two-hour work periods to complete simple and detailed tasks (but without

22   intensive proximity to others); could interact appropriately in brief, casual encounters with the

23   public and to respond appropriately to supportive, and non-confrontational feedback and

24   supervision; his working environment should limit continuous and prolonged contact with

25   others; and that he could respond appropriately to gradual and infrequent changes in work

26   routine. (AR 1035.)

27           Finally, in assessing his functional capacity, she opined that he had adequate memory and

28   concentration, but "does not have adequate social skills and would not be able to maintain

- 14 -

1  appropriate interaction with supervisors, co-workers, and the public." (AR 1035.)

2  **4. May 2009-August 2010**

3  Plaintiff saw VA staff psychiatrist John C. Vanbiber, M.D., on May 28, 2009, and

4  discussed an asserted prior head injury and its relationship to his mood instability. (AR 902.) He

5  reported getting uptight occasionally and feeling "like he has thoughts talking to him"

6  occasionally. (AR 902.) Dr. Vanbiber noted Plaintiff was somewhat on edge, but that minimizing

7  stressors had helped his emotional condition. (AR 903.) Dr. Vanbiber opined that Plaintiff was

8  "unemployable" as a result of his bipolar disorder and that he was not able to tolerate increased

9  stressors without significant deterioration of his mood. (AR 903.) He was advised to continue

10  medications and was prescribed additional medications for mood stability, psychosis, chronic

11  headaches and to aid his sleep. (AR 903.)

12  Plaintiff underwent a neuropsychology consultation on July 7, 2009, where it was noted

13  that Plaintiff reported a fall during his military service for which he sustained a loss of

14  consciousness and required rehabilitation as well as a prior concussion playing football which

15  required a six week hospital admission. (AR 1128.) An MRI of the brain in March 2009 showed

16  a small mass in the right side of the fourth ventricle, and a second MRI of the brain taken in June

17  2009 showed a small micradenoma of the right posterior pituitary gland. (AR 1128.) The

18  provider noted that Plaintiff appeared very drowsy during his assessment, and at several points

19  seemed to be falling asleep. (AR 1129.) This may have had an impact on his cognitive

20  functioning scores. (AR 1129.) The provider found Plaintiff had mild impairment in his auditory

21  attention span. (AR 1129.) He had moderate impairment in his ability to rapidly process and

22  transcribe numbers and symbols due to slowness in completing the transcription. (AR 1130.) His

23  score on a simple visual motor tracking test was average, and his memory functioning scores

24  were between average and above average. (AR 1130.) His ability to immediately recall a

25  complex geometric figure, however, was in the range of severe impairment. (AR 1130.) His

26  conversational speech was within normal limits. (AR 1130.) His scores were intact on a test of

27  the ability to utilize abstract concepts to problem-solve. (AR 1130.) Ultimately, the provider

28  concluded that the deficits found during the evaluation were due entirely to Plaintiff's altered

1    mental status, *i.e.*, his drowsiness. (AR 1131.)

2           On July 20, 2009, Plaintiff complained his prescribed medication was not helping him to

3    sleep, and reported his sleep had decreased from eight to nine hours a night to four to five hours.

4    (AR 1119.) His provider did not that he had a pleasant affect and euthymic mood. (AR 1119.)

5           Plaintiff's first visit with Dr. Drymalski was on August 26, 2009. (AR 1135.) He reported

6    a history of mood swings and auditory hallucinations, as well as problems sleeping. (AR 1135.)

7    He stated that his current medication, Ambien, was not aiding his sleep. (AR 1135-1136.) He

8    said that Depakote kept his mood stable. (AR 1136.) Dr. Drymalski described plaintiff as alert

9    and oriented, polite and cooperative, with no evidence of altered perceptions or delusional or

10   obsessive thinking. (AR 1136.) He was given a trial of Lunesta for sleep. (AR 1136.)

11          On September 19, 2009, he reported his mood was "great" and he was sleeping seven

12   hours per night. (AR 1115.) He denied anxiety, agitation, or mood swings at this time. (AR

13   1115.)

14          On October 7, 2009, Plaintiff told Dr. Drymalski Lunesta was working well for his sleep;

15   however, he had some nightmares the previous week and asked to get involved in some kind of

16   therapy. (AR 1667.) Then on October 15, 2009, Plaintiff indicated he was not interested in group

17   therapy, and called to state he was going of all of his medications except Lunesta. (AR 1663,

18   1112.) He then had "two explosive episodes" of anger toward his seventeen year old step-child.

19   (AR 1112.) He denied physical violence, but stated he needed to get back on his medications,

20   and they were renewed. (AR 1112.)

21          During this call, Plaintiff stated he was afraid of his behavior and the following day

22   Plaintiff saw a VA social worker. (AR 1657-1660.) At the appointment, Plaintiff said that he was

23   afraid for his own life because his fiancé, her daughter, and the daughter's friend were connected

24   to the Hells Angels and the friend told Plaintiff that if he decided to leave his fiancé the friend

25   would "snap his neck." (AR 1658.) The social worker confronted Plaintiff with the discrepancy

26   between his phone call to the VA and the situation he was now presenting. (AR 1658.) Plaintiff

27   downplayed the outbursts with the step-daughter, and then became agitated with the

28   confrontation. (AR 1658.)   He was described as alert and oriented, but his affect was

1    incongruent—sometimes he was agitated and at other times he was calm. (AR 1659.) The
2    provider noted that his insight seemed poor and his judgment impaired. (AR 1659.) The social
3    worker discussed admission for stabilization on medications, but Plaintiff declined. (AR 1659.)

4        Plaintiff saw Dr. Drymalski on October 21, 2009. (AR 1655-1656.) He reported going
5    through a "crisis" the prior week where his girlfriend invited a wanted "fugitive" into their home,
6    which upset him. (AR 1655.) He reported throwing his medications away because he wanted to
7    see how he did without them, which left him feeling irritable and anxious. (AR 1655.) He
8    reported he was back on his medications and was feeling better. (AR 1655.) She noted that he
9    was alert, oriented, polite and cooperative with a euthymic mood. (AR 1655.) She stated that
10   "again (as in the past) does not want to spend much time in with [sic] the visit." (AR 1655.)

11       On November 20, 2009, Plaintiff reported to Dr. Drymalski that his mood was "okay,"
12   but his PTSD symptoms were "really bad." (AR 1635.) He indicated he had been waking up
13   several times a night in a sweat and was more paranoid. (AR 1635.) Dr. Drymalski nevertheless
14   described him as alert and oriented, polite and cooperative, with a euthymic mood. (AR 1635.)
15   His Lunesta dosage was increased and he was instructed to continue on his other medications.
16   (AR 1635.)

17       On December 1, 2, and 3, 2009, Plaintiff called and complained he was having insomnia,
18   sleeplessness, nightmares, anxiety and depression. (AR 1626, 1630, 1632.) He reported similar
19   complaints on December 7 and 8, 2009. (AR 1610, 1611, 1614, 1616.)

20       In the beginning of December 2009, Plaintiff expressed an interest to the VA in going
21   back to work and his mental disorders were assessed with respect to potential vocational
22   rehabilitation by a VA clinical psychologist, Elizabeth Mosco, Ph.D. (AR 1617-1618.) It was
23   noted that Plaintiff had been hospitalized at the VA in Virginia in July 2008 for medication
24   overdose. (AR 1619.) At this time, in December 2009, he reported that his medications were not
25   helpful or effective. (AR 1619.) He stated he had sleep apnea and a sleep impairment, and a
26   chronic depressed mod. (AR 1619.) He had been sleeping only two to three hours a night with
27   nightmares and paranoia. (AR 1620.) He became acutely anxious at time and had panic
28   symptoms. (AR 1620.) While he had a history of suicidal ideation, he reported he did not have

suicidal ideations at that time. (AR 1621.) He denied having angry outbursts, but the examiner noted that his records reflecting episodes of yelling. (AR 1621.) Dr. Mosco pointed to an October 2009 incident of yelling with his fiancé's daughter where he reported he was fearful his fiancé would kick him out of the apartment, and an incident in April 2007, where he became agitated and choked his wife. (AR 1621.)

Dr. Mosco stated that Plaintiff had moderate problems with household chores; severe problems with shopping; moderate problems with bathing; and severe problems engaging in sports or exercise and driving. (AR 1621.)

Dr. Mosco did note some discrepancies in Plaintiff's records, including those pertaining to his relationships and children, hospitalizations and PTSD events. (AR 1622.)

Dr. Mosco concluded Plaintiff's remote and recent memory were both moderately impaired. (AR 1622.) Dr. Mosco stated Plaintiff was not employed because of: concentration difficulties, confusion, social discomfort, a general inability to manage routine daily activities such as daily personal hygiene, grocery shopping, etc. (AR 1623.) His lethargy also contributed to his inability to sustain employment. (AR 1623.) His GAF score was 41. (AR 1623.)[8] Plaintiff had severe mood symptoms including depressive symptomology with auditory hallucinations mixed with manic symptoms involving some degree of impulsivity and irritability. (AR 1624.) He also had impaired sleep, felt paranoid, lived in extreme social isolation, and had relationship difficulties. (AR 1624.)

On December 27, 2009, Plaintiff complained of fatigue. (AR 1601.) Dr. Drymalski called him two days later to discuss his sleep and nightmare issues. (AR 1597.) He was advised to taper off another medication for migraines which had a side-effect in some people of causing

---

[8] "GAF" is a Global Assessment of Functioning. "'A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.'" *Garrison*, 759 F.3d at n. 4 (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164, n. 2 (9th Cir. 1998)). "According to the DSM-IV, a GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.' A GAF score between 51 to 60 describes "moderate symptoms" or any moderate difficulty in social, occupational, or school functioning. Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of disability (or interact with physical impairments to create a disability), they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects." *Id*. (citing *Titles II & XVI: Capability to Do Other Work-Themedical-Vocational Rules As a Framework for Evaluating Solely Nonexertional Impairments*, SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343 (S.S.A. 1985)).

1   nightmares. (AR 1597.)

2       On January 1, 2010, he still complained of nightmares and reported depression. (AR

3   1111.) The following day, he once again complained of having been depressed for four weeks

4   and of nightmares. (AR 1594.)

5       Plaintiff was admitted to the VA on January 5, 2010 and discharged on January 8, 2010.

6   (AR 1191-1194.) He saw Dr. Drymalski the day before his admission and reported decreased

7   sleep, vague homicidal ideation, racing thoughts and nightmares for three weeks. (AR 1191.) He

8   was only sleeping two or three hours per night. (AR 1191, 1558.) He had increased irritability

9   and wanted to come to the VA to avoid hurting his wife. (AR 1191.) He described his dreams

10  related to combat in Iraq, which occurred once or twice a night and caused him to wake up in a

11  sweat. (AR 1191.) He had mild depression, but denied major stressors which could have brought

12  on this episode. (AR 1191.) He denied hallucinations, paranoia, delusions, decreased

13  concentration, panic attacks, obsessions, compulsions and anxiety. (AR 1191.) Plaintiff was

14  admitted, with possible manic episode onset and sought to have himself stabilized. (AR 1544,

15  1588.) On intake he was cooperative, but extremely agitated, and stated he was "over living with

16  these nightmares." (AR 1589.) His medications were adjusted to stabilize his mood and help with

17  sleep. (AR 1546.) As his hospital stay extended, his mood improved. (AR 1193, 1544, 1559.) His

18  nightmares and irritability likewise decreased. (AR 1193, 1544, 1547.)

19      Plaintiff saw Dr. Drymalski again on January 13, 2010. (AR 1535.) His nightmares were

20  better, but he was still not sleeping well. (AR 1536.) His mood was "okay," and he was anxious

21  about his sleep. (AR 1536.) He was alert, oriented, polite and cooperative with a mood that was

22  tired but euthymic. (AR 1536.) He was told to discontinue some medications in an effort to help

23  him sleep. (AR 1536.) His depression screen was negative, but his PTSD screen was positive.

24  (AR 1536-1537.)

25      On January 19, 2010, Plaintiff called to state that the medication changes made to address

26  his insomnia were not working. (AR 1535.) He saw Dr. Drymalski on January 22, 2009. (AR

27  1530-1532.) His mood was "okay," but he was still anxious about his insomnia, indicating that

28  he had not slept in two nights. (AR 1531.) He was alert and oriented, polite and cooperative and

1   his mood was again tired but euthymic. (AR 1531.) His medications were adjusted. (AR 1531.)

2   On February 23, 2010, Plaintiff called to once again state that he had not been able to

3   sleep for two days because of nightmares despite taking his medication. (AR 1478.)

4   On March 3, 2010, Plaintiff stated he was doing well from a mental health standpoint.

5   (AR 1472.)

6   On March 18, 2010, Plaintiff presented to the VA mental health emergency department

7   requesting help with finances and housing. (AR 1466-1468.) At that time, he reported his mood

8   was "mediocre," and rated his depression as a five on a scale of one to ten, with the following

9   qualifier: "it's fine, for me, 5 is actually good." (AR 1466.) He expressed several PTSD

10  symptoms including nightmares, hyperarousal, hypervigilance, and avoidance. (AR 1467.) There

11  was a note that he may have cognitive impairment which was affecting his inability to maintain

12  housing and manage his finances. (AR 1468.)

13  On March 26, 2010, Plaintiff saw Dr. Drymalski and reported he had restarted

14  Risperidone because he felt it helped his mood. (AR 1457.) He stated that he was sleeping well

15  and that his mood was stable. (AR 1457.) He was described as alert, oriented, polite, cooperative

16  and he was tired but his mood was euthymic. (AR 1457.)

17  Plaintiff was seen by a VA social worker on March 30, 2010, for an assessment with

18  Healthcare for Homeless Veterans (HCHV). (AR 1462-1464.) The social worker indicated he

19  appeared agitated with an anxious mood. (AR 1464.)

20  A depression/PTSD screening was performed on April 16, 2010. (AR 1441-1442.) He

21  had a negative screen for depression, but a positive screen for PTSD. (AR 1441-1442.) On the

22  same date, Plaintiff saw VA staff psychologist, James A. Dandrea, Ph.D. (AR 1443-1447.)

23  Plaintiff complained of nightmares and relayed that he had seen a fellow service member shoot

24  himself, which was traumatic. (AR 1444.) He said that he woke up in a sweat nearly every night

25  and was only getting two hours of sleep. (AR 1444.) His mood was depressed. (AR 1444.) He

26  tried to watch television to avoid thinking about the incident, but still experienced flashbacks

27  approximately four times a week. (AR 1444.)  He spent his time watching television, playing

28  computer games and going to the gym to exercise. (AR 1445.) Dr. Dandrea described Plaintiff's

1   affect as calm and Plaintiff denied suicidal ideation as well as difficulty concentrating. (AR
2   1445.) He was attentive throughout the interview. (AR 1446.) He achieved a GAF score of 50.
3   (AR 1446.) His treatment plan included gaining coping skills to manage PTSD symptoms and
4   attending PTSD education classes. (AR 1447.)

5       Plaintiff saw Dr. Drymalski on April 26, 2010, and reported his mood was stable, but he
6   was having insomnia problems again due to nightmares. (AR 1433.) He was described as polite
7   and cooperative with a euthymic mood. (AR 1434.) He was given a trial medication for
8   nightmares and sleep. (AR 1434.) On April 28, 2010, he called stating that the medication he
9   received for his nightmares was not working. (AR 1427.)

10      Plaintiff called the VA on May 19, 2010, stating he had chronic problems with sleep and
11  nightmares. (AR 1405.)

12      On June 2, 2010, Plaintiff presented for an assessment of his symptoms and discussion of
13  treatment for PTSD. (AR 1388-1389.) He had no difficulty maintaining concentration or
14  attention. (AR 1389.) His mood was described as depressed and his affect was constricted. (AR
15  1389, 1729.) He appeared tired. (AR 1728.) On June 8, 2010, a trauma assessment and
16  determination of appropriateness of PTSD treatment was completed. (AR 1375-1386.) Plaintiff
17  complained of nightmares and that he was only getting two hours of sleep per night, and also
18  experienced intrusive memories and flashbacks during the day. (AR 1377.) He felt tense and
19  jumpy. (AR 1377.) He reported his mood was depressed. (AR 1377.) During this assessment, he
20  said that the medications were "a little helpful," but he did not find the counseling helpful. (AR
21  1378.) He reported he spent his time watching television, playing computer games and going to
22  the gym to exercise. (AR 1379.) The assessor described Plaintiff as calm, alert and attentive. (AR
23  1381.) He answered questions without difficulty. (AR 1381.) His mood was described as
24  depressed and his affect was constricted. (AR 1381.)

25      When Plaintiff saw Dr. Drymalski on June 17, 2010, he reported his nightmares had
26  improved quite a bit and his other medications were helpful. (AR 1372.) He was described as
27  polite and cooperative with a euthymic mood. (AR 1372.)

28      On July 9, 2010, Plaintiff called the VA stating that he was feeling depressed. (AR 1367.)

1   When he received a call back on July 12, 2010, he said that he had been frustrated and off of his

2   medications for four days because they had been sent to his old address. (AR 1368.) He indicated

3   he was feeling better once he got back on his medications. (AR 1368.)

4        Plaintiff was admitted at the VA from July 24 through July 27, 2010, for depression. (AR

5   1186-1187.) He complained of poor sleep and low energy with "so-so" concentration. (AR

6   1186.) He indicated he was still having nightmares twice a week. (AR 1186.) He described his

7   mood as a seven on a scale of one to ten. (AR 1186.) His condition improved through his

8   admission, and before he was discharged he reported feeling "great." (AR 1187.) He was given

9   medication for mood stabilization, sleep and nightmares and was discharged. (AR 1187-1188.)

10   On July 30, 2010, he reported he was "doing okay." (AR 1307.)

11        On August 10, 2010, Plaintiff said his mood and sleep were "good." (AR 1105.) He was

12   sleeping seven hours a night. (AR 1105.) He denied feeling depressed. (AR 1105.) He was

13   described as having a cheerful affect and euthymic mood. (AR 1105.)

14   **5. Dr. Drymalski's February 9, 2011 Opinions Re: Plaintiff's Ability to Work**

15        Dr. Drymalski completed a medical opinion regarding Plaintiff's ability to do work-

16   related activities on February 9, 2011. (AR 1783-1785.)

17        His ability to do the following activities was determined to be good: understanding and

18   remembering and carrying out short and simple instructions; sustaining an ordinary routine

19   without special supervision; making simple work-related decisions; asking simple questions or

20   requesting assistance; and being aware of normal hazards and taking appropriate precautions.

21   (AR 1783.)

22        His ability to do the following activities was characterized as fair: remembering work-

23   like procedures; maintaining attention for a two-hour segment; maintaining regular attendance

24   and being punctual; working in coordination with or in proximity to others without being unduly

25   distracted; completing a normal work day or week without interruption from psychologically

26   based symptoms; performing at a consistent pace without an unreasonable number and length of

27   rest periods; accepting instructions and responding appropriately to criticism from supervisors;

28   getting along with coworkers or peers without unduly distracting them or exhibiting behavioral

extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress. (AR 1783.) The explanation given for the limitations falling into the fair category was his bipolar disorder and PTSD which cause him to be easily distracted, irritable and to have a low tolerance for frustration. (AR 1783-1784.)

Dr. Drymalski stated that Plaintiff's mental abilities to understand, remember and carry detailed instructions, set realistic goals or make plans independently with others, and deal with stress of semiskilled or skilled work were poor or he did not have these abilities. (AR 1784.)

His ability to do the following was characterized as fair: interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel to an unfamiliar place and use public transportation. (AR 1784.) She stated that Plaintiff is easily irritated and has demonstrated some inappropriate behaviors. (AR 1784.) In addition, he has trouble interacting with people, coworkers, the public and supervisors, and has problems staying focused and with concentration. (AR 1784.) On average, she anticipated that Plaintiff's impairments or treatment would cause him to be absent from work more than three times a month. (AR 1784.)

**6. July 2011-September 2011**

Plaintiff subsequently relocated to Las Vegas, Nevada, and presented to the VA there on July 13, 2011, to refill his mental health medications and was assessed by the department. (AR 1842.) He presented with his new wife (his third wife, whom he had married on July 2, 2011), and reported a history of mood fluctuations. (AR 1843.) He had run out of his medications a month prior and had been agitated but not aggressive. (AR 1843.) He denied significant depression, but indicated he still had fluctuating moods. (AR 1843.) He reported periodic nightmares. (AR 1843.) It was noted he was distracted and had issues with focusing. (AR 1843.) He reported not being able to obtain a job due to having a low frustration tolerance. (AR 1844.) In his spare time, he stayed home and watched sports on television, played poker on the computer, and was planning to go to culinary school. (AR 1844-1845.) He identified his mood as a barrier to achieving his mental health goals. (AR 1845.)

He denied a history of head trauma (although he had indicated to the contrary in the past).

(AR 1846.) His mental status examination indicated he was cooperative and not hostile or agitated. (AR 1847.) His GAF score was listed as between 55 and 60. (AR 1848.) He did state he had trouble falling and staying asleep for several days. (AR 1850.)

On August 1, 2011, he reported intermittent agitation and irritable mood. (AR 1839.) He stated he was sleeping for six hours per night for the most part. (AR 1839.) He denied depression. (AR 1839.) He was described as cooperative with a dysphoric mood. (AR 1840.) The following day, he called and reported that he was agitated. (AR 1838.)

Plaintiff was admitted to the Spring Mountain Treatment Center from August 13-15, 2011, for complaints of agitation after he was told he could not refill his prescriptions in the emergency department and was put on a legal hold. (AR 1858.) He was described as irritable and withdrawn. (AR 1868.) Following admission, he became calm. (AR 1858.) During his stay he reported that he works out and builds models. (AR 1863.) He indicated he was to start culinary school the day after discharge. (AR 1858.) His GAF score was 65. (AR 1859.) He was discharged as stable. (AR 1858.)

Plaintiff was next seen on September 9, 2011. (AR 1834.) He reported continuing mood swings. (AR 1834.) He was described as somewhat irritable, but cooperative. (AR 1835.) His affect was constricted and he had a dysphoric mood with underlying anger. (AR 1835.)

**7. September 27, 2011 Mental RFC Assessment**

A mental RFC assessment was prepared on September 27, 2011, by Mark Richman, Ph.D.. (AR 1795-1809.) The assessment consisted of a serious of pages with boxes that were checked indicating the level of Plaintiff's limitations, *i.e.,* not significantly limited, moderately limited, markedly limited, etc., with limited notes from the consultant. Dr. Richman found Plaintiff was moderately limited in his abilities to: understand and remember and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to set realistic goals or making plans independently of others. (AR 1795-1796.)

1    Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in

2    maintaining social functioning, concentration, persistence or pace. (AR 1807.) It was noted that

3    his problems with handling his anger improved with psychiatric treatment, and his medications

4    were helpful. (AR 1809.)

5    Dr. Richman ultimately concluded Plaintiff could sustain a regular work week, make

6    simple decisions and adapt to change. (AR 1797.)

7    **8. November 2011 to July 2012**

8    Plaintiff was seen by mental health at the VA in Las Vegas on November 21, 2011, with

9    complaints of stress, stating he could not deal with school or his daily activities. (AR 1825.) He

10   was asked why the appointment was made and he said he did not need counseling but medication

11   and walked out. (AR 1826.) He was scheduled to see his psychiatrist the following day.

12   A letter was drafted by Plaintiff's provider to be sent to  the Le Cordon Blue cooking

13   school, stating that Plaintiff continued to have significant mood and anxiety symptoms and poor

14   frustration tolerance and anxiety symptoms. (AR 1827.) These symptoms were said to interfere

15   with his functioning at school, stating that it may take a longer time for him to take tests and

16   learn things. (AR 1827.)

17   Plaintiff was seen by mental health at the VA in Las Vegas on November 22, 2011. (AR

18   1823.) His wife thought he was too sleepy and wondered about excessive medications. (AR

19   1824.) He continued to have problems with anger and irritability. (AR 1824.) He was attending

20   Le Cordon Bleu cooking school, but needed extra help due to his mental health conditions. (AR

21   1824.) He described his moods as somewhat more stable. (AR 1824.)  He was pleasant and

22   cooperative with an appropriate affect and euthymic mood. (AR 1824.)

23   Plaintiff was seen on January 30, 2012 by mental health at the VA in Las Vegas. (AR

24   1820.)  He described his moods as quite stable, and indicated he was going to school at night and

25   was looking for daytime restaurant work and was going to have people over for a Super Bowl

26   party. (AR 1820.)  He was described as pleasant and cooperative with appropriate affect and

27   euthymic mood. (AR 1820.)

28

**B. Plaintiff's Testimony**

At his initial hearing in this matter, on February 16, 2011, Plaintiff testified he was unable to hold a job because he had bouts with paranoia, schizophrenia, depression and had thoughts of suicide. (AR 46.) At that time, he testified he had been hospitalized related to his mental illness two or three times. (AR 46.) He was diagnosed with bipolar disorder and PTSD. (AR 47.) He previously worked as a cook and security guard. (AR 47-48.) He was in the military for three years between 2000 and 2003, and was honorably discharged for reasons related to his mental health. (AR 48.) He receives service-related disability from the VA; therefore, he receives his medical care through the VA. (AR 48-49.)

With respect to his depression, he testified that he experienced uncontrollable crying three or four times a week. (AR 53.) He thought of committing suicide on one or two occasions since 2008. (AR 54.) He also had problems sleeping, and was getting only four or five hours of sleep a night at the time. (AR 55.)

His PTSD caused him to be jumpy and unable to engage in activities that might trigger an episode. (AR 55.) It also resulted in anxiety attacks and paranoia with an elevated heart rate and difficulty breathing. (AR 56.) These anxiety attacks occurred three to four times a week both in the home and outside of the home, but more frequently when he was out of the house. (AR 56-57.) They would last up to an hour. (AR 57.)

He testified that four or five times a week he would make plans for a day that he could not follow through with because he would wake up feeling depressed and could not do anything. (AR 61.) As a result, he had to plan activities around his moods. (AR 61-62.) He generally did not feel like leaving his house on a daily basis. (AR 62.) He was able to do laundry, cook and complete housework, depending on how he was feeling on a particular day. (AR 63.) He lived alone and was able to go grocery shopping. (AR 65.) He had no social activities outside of the home, and only talked to one friend on the phone twice a week. (AR 67-68.) Otherwise, the only things he did at home were watch sports on television and read occasionally. (AR 68.)

At his hearing on May 23, 2012, Plaintiff once again testified that he attended high school and then spent three years in the military and received a medical discharge related to his

1    mental health. (AR 74.) He had enrolled in cooking school at Le Cordon Bleu, where he had

2    been attending courses since approximately August 2011. (AR 74.) The classes are Monday

3    through Friday, from six to ten o'clock in the evening. (AR 77.) He is there on an "ADA-

4    supported 504 program" whereby he gets certain accommodations, including a tutor, extra time

5    on tests, special considerations for projects, and is graded on a curve. (AR 76.) In addition, he is

6    afforded the opportunity to step outside of a course and call his wife and calm down, which he

7    estimated occurred approximately once or twice a day; although, he stated that most of the time

8    he calls his wife when he is on his scheduled break. (AR 76.)  Since he started school, he had

9    missed class approximately five times. (AR 76.) He testified that he did not have difficulty

10   getting along with other people in the school, although he does have difficulty in general getting

11   along with others. (AR 77.) He gets frustrated with people easily, and there are times when he

12   yells and screams at people, but he does not go beyond that, for example, to kicking or punching

13   inanimate objects or breaking things. (AR 77.) In fact, he stated that on his medication he

14   manages to keep in the verbal stage. (AR 77.)

15        He further testified that he was not experiencing any side effects from medications he

16   was taking (Olanzapine for his bipolar disorder; Omeprazole for acid reflux; Vicodin for back

17   and knee pain). (AR 75, 78.)

18        For his mental health issues, he treated with Dr. Drymalski for a period of two years,

19   seeing her approximately every sixty to ninety days. (AR 75.) He also treated with

20    Dr. Montesclaros who is with the VA in Las Vegas. (AR 75.) At the time of the hearing, he had

21   only seen her four times. (AR 75.) He testified that he does isolate himself when he is depressed,

22   and either falls asleep or tries to take deep breaths to relax. (AR 79.) When he calms down, he

23   likes to discuss what happened. (AR 79.)

24        He also estimated that he "flame[s] out" or is unable to get along or maintain persistence

25   or pace because of his symptoms between one and three times a day, depending on his level of

26   interaction with people. (AR 80.)

27   ///

28   ///

- 27 -

1    **C. Plaintiff's Credibility**

2        **1. Applicable Law**

3        "[A] claimant's credibility becomes important at the stage where the ALJ is assessing

4    residual functional capacity, because the claimant's subjective statements may tell of greater

5    limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th

6    Cir. 2001) (citing SSR 96-7p (1996)). Thus, a claimant's credibility is often crucial to a finding

7    of disability. The ALJ is responsible for determining credibility. *Meanel v. Apfel*, 172 F.3d

8    1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 750; *see also Lingenfelter v. Astrue*, 504

9    F.3d 1028, 1035-36 (9th Cir. 2007).

10        In general, when deciding to accept or reject a claimant's subjective symptom testimony,

11    an ALJ must engage in two steps: an analysis under *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir.

12    1986) (the "*Cotton* test"), and an analysis of the credibility of the claimant's testimony regarding

13    the severity of his or her symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *see*

14    *also* 20 C.F.R. § 404.1529 (adopting two-part test).

15        First, under the *Cotton* test, a claimant who alleges disability based on subjective

16    symptoms "must produce objective evidence of an underlying impairment 'which could

17    reasonably be expected to produce pain or other symptoms alleged.'" *Bunnell v. Sullivan*, 947

18    F.2d 341, 344 (9th Cir. 1991) (en banc) (citing 42 U.S.C. § 423(d)(5)(A)); *see also Berry v.*

19    *Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th

20    Cir. 2007). This test "imposes only two requirements on the claimant: (1) [he or] she must

21    produce objective medical evidence of an impairment or impairments; and (2) [he or] she must

22    show that the impairment or combination of impairments *could reasonably be expected to* (not

23    that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (emphasis

24    original); *see also* 20 C.F.R. § 404.1529(a)-(b).

25        "Second, if the claimant meets the first test, and there is no evidence of malingering, the

26    ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

27    specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal

28    quotation marks and citation omitted); *see also Valentine v. Comm'r of Soc. Sec. Admin.*, 574

1  F.3d 685, 693 (9th Cir.  2009). "This is not an easy requirement to meet: 'The clear and

2  convincing standard is the most demanding required in Social Security cases.'" *Garrison*, --- F.3d

3  ---, 2014 WL at * 16 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.

4  2002)).

5      An ALJ's credibility findings are entitled to deference if they are supported by substantial

6  evidence and are "sufficiently specific to allow a reviewing court to conclude the adjudicator

7  rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a

8  claimant's [symptom] testimony.'" *Bunnell,* 947 F.2d at 345 (quoting *Elam v. Railroad*

9  *Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991)). "General findings are insufficient; rather,

10  the ALJ must identify what testimony is not credible and what evidence undermines the

11  claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted).

12      **2. ALJ's Findings**

13      At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity

14  since his alleged onset date of June 1, 2008. (AR 23.) At step two, the ALJ found Plaintiff had

15  the following severe impairments: bipolar affective disorder, PTSD, myofascial joint pains with

16  history of back and knee pain, hallux limitus of the right foot with degenerative joint disease,

17  chronic cholecystitis with cholelithiasis status post laparoscopic cholecystectomy, sleep apnea

18  and history of headaches. (AR 24.) At step three, the ALJ concluded that Plaintiff did not have

19  an impairment or combination of impairments that met or medically equaled the severity of one

20  of the Listed Impairments. (AR 25-26.)

21      At step four, the ALJ concluded Plaintiff has the RFC to perform unskilled light work, as

22  defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except he can occasionally kneel, crawl and

23  climb stairs and ramps, and can frequently balance, stoop and crouch; he can never climb

24  ladders, ropes or scaffolds; he can never perform work activities that require exposure to cold

25  temperatures and hazards; he can have brief and superficial dealings with supervisors, coworkers

26  and the public; and he is able to respond appropriately to gradual and infrequent changes in work

27  routine. (AR 26.)

28      In making this determination, the ALJ concluded that while Plaintiff's medically

- 29 -

determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. (AR 27.) The ALJ found that the evidence demonstrated that Plaintiff's symptoms were controlled with medication and that he was able to perform most basic work activities. (AR 27.) The ALJ pointed out that Plaintiff denied mood swings, irritability, anger, agitation, anxious feelings, and a decreased interest in pleasurable activities, reported his mood was "great" and was stable, and denied suicidal ideation and homicidal ideation. (AR 27.) The ALJ noted that Plaintiff reported sleeping seven hours on Lunesta, his activity level was normal, and he denied feelings of hopelessness. (AR 27.)

The ALJ also found the objective medical evidence did not support Plaintiff's allegations. (AR 27.) The ALJ pointed to Plaintiff's mental status examination which described him as having an adequate appearance, good eye contact, a pleasant affect, a euthymic mood, normal memory, coherent and reality based speech, normal self-care and activities of daily living. (AR 27.) The ALJ concluded that Plaintiff's described activities of daily living were not as limited as one might expect given his allegations, including the fact that he studied at culinary school. (AR 28.) The ALJ acknowledged Plaintiff attended culinary school through the ADA 504 program, but said the course included activities that were beyond the mental RFC capacity assessed by the ALJ. (AR 28.)

The ALJ also mentioned there may be a lack of motivation to work based on the fact that Plaintiff's license had been revoked for failing to pay child support, and if he were working his wages could be garnished. (AR 28.)

In addition, the ALJ stated generally that there are inconsistencies in the record concerning Plaintiff's medical history that render his allegation less persuasive. (AR 28.)

**3. Analysis**

The court finds that the ALJ's findings concerning Plaintiff's credibility and Dr. Drymalski's opinions are not supported by substantial evidence in the record, and therefore, respectfully concludes that the ALJ erred.

1    As was noted above, Plaintiff treated with various mental health providers through the

2    VA and the medical records submitted in support of his claim are extensive. Plaintiff's records

3    make clear that he has struggled with various diagnosed mental impairments, including bipolar

4    disorder and PTSD as well as related mood swings, agitation, insomnia, and nightmares. He has

5    been admitted to mental health facilities on several occasions, and experienced suicidal and

6    homicidal ideations from time to time. As the ALJ noted, Plaintiff did report several times that

7    his mood was "good" or even "great," that he was sleeping well and that his medications were

8    working to manage his condition. On probably just as many occasions, however, he reported a

9    depressed or agitated mood, severe insomnia and nightmares and complained that his

10   medications were not helping or that he had stopped taking them to see if his condition would

11   improve.

12   As the court in *Garrison* pointed out, "[c]ycles of improvement and debilitating

13   symptoms are a common occurrence" in the realm of mental health issues. *Garrison*, 759 F.3d at

14   1017. In such circumstances when the plaintiff's symptoms wax and wane, as they have here, "it

15   is error for an ALJ to pick out a few isolated instances of improvement over a period of months

16   or years and to treat them as a basis for concluding a claimant is capable of working." *Id.* (citing

17   *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). "[The treating physician's]

18   statements must be read in context of the overall diagnostic picture he draws. That a person who

19   suffers from severe panic attacks, anxiety, and depression makes some improvement does not

20   mean that the person's impairments no longer seriously affect her ability to function in a

21   workplace." *Holohan*, 246 F.3d at 1205. In *Garrison*, the Ninth Circuit cited to the following

22   language from an Eighth Circuit decision to further illustrate this point:

23       With regard to mental disorders, the Commissioner's decision must take into
         account evidence indicating that the claimant's true functional ability may be
24       substantially less than the claimant asserts or wishes. Given the unpredictable
         course of mental illness, [s]ymptom-free intervals and brief remissions are
25       generally of uncertain duration and marked by the impeding possibility of relapse.
         Moreover, [i]ndividuals with chronic psychotic disorders commonly have their
26       lives structured in such a way as to minimize stress and reduce their signs and
         symptoms. Such individuals may be much more impaired for work than their
27       signs and symptoms would indicate.

28

1    *Garrison*, 759 F.3d at n. 22 (quoting *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2011)

2    (alterations original)).

3          "Reports of 'improvement' in the context of mental health issues must be interpreted with

4    an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison*,

5    759 F.3d at 1017 (citing *Ryan*, 528 F.3d at 1200-01). "They must also be interpreted with an

6    awareness that improved functioning while being treated and while limiting environmental

7    stressors does not always mean that a claimant can function effectively in a workplace." *Id*.

8    (citation omitted).

9          Here, the ALJ did exactly what the Ninth Circuit confirmed in *Garrison* should not be

10   done: "Rather than describe [Plaintiff's] symptoms, course of treatment, and bouts of remission,

11   and thereby chart a course of improvement, the ALJ improperly singled out a few periods of

12   temporary well-being from a sustained period of impairment and relied on those instances to

13   discredit [Plaintiff]." *Garrison*, 759 F.3d at 1018. The ALJ stated that Plaintiff's mood was

14   described as great, and that his condition was controlled with medication. He pointed to the

15   examination with Dr. Lewis,

16         The examples of improvement chosen by an ALJ, however, "must *in fact* constitute

17   examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id*.

18   This is not the case here. The ALJ's conclusion ignores the fact that Plaintiff's symptoms of

19   agitation and depression came and went. While his mood was described as great on a few

20   occasions, he was described as depressed and/or agitated on just as many, if not more, visits with

21   mental health professionals. His sleeplessness and nightmares were an almost constant issue,

22   sometimes being relieved with medication, but almost always recurred.

23         In addition, several of the treatment records indicate that Plaintiff's goal was to minimize

24   stressors in order to manage his depression symptoms. At times minimizing stressors appeared to

25   improve his condition, at other times it was noted that Plaintiff was still agitated and depressed

26   even when no stressors were present.

27         The ALJ also concluded that Plaintiff's daily activities indicated that he could perform

28   basic work activities, relying principally on the fact that Plaintiff was able to attend culinary

school. While this fact does detract from Plaintiff's claim of debilitating limitations, the ALJ was required to view this fact in the context of Plaintiff's bigger mental health picture. The record contains various references that Plaintiff was unable to sustain employment because of his mental condition. Moreover, the ALJ did not acknowledge that the ability to participate in this course may not translate into an ability to perform a job.

Dr. Lewis noted that Plaintiff's jobs lasted on average 3 months until he was fired for not performing his job or yelling at supervisors. (AR 1014.) In fact, Dr. Lewis, whose opinions the ALJ gave "great weight," opined Plaintiff had poor social skills and that his manner would cause supervisors to quickly lose patience with him. (AR 1015.) He further opined that his irritability would impact his ability to interact appropriately with supervisors, coworkers and the general public. (AR 1017.) In her April 2009 psychiatric assessment of Plaintiff, Dr. Kotler likewise concluded that Plaintiff did not have adequate social skills to maintain appropriate interaction with supervisors, coworkers and the public.

A VA staff psychiatrist who evaluated Plaintiff in May 2009 opined that Plaintiff was "unemployable" as a result of his bipolar disorder, stating that he was not able to tolerate increased stressors without significant deterioration of his mood. (AR 903.)

Other than his ability to attend culinary school, the ALJ did not discuss what other daily activities Plaintiff was able to perform that would indicate an ability to perform basic work activities. When Plaintiff was examined by Dr. Lewis in April 2009, he described a typical day as watching television. (AR 1016.) Plaintiff reported that he could take care of his "basic needs," and that he got together with one friend for coffee and shopping. (AR 1016.) Plaintiff described similar daily activities to VA staff psychologist James A. Dandrea, Ph.D., on April 16, 2010 (he spent his time watching television, playing computer games and going to the gym to exercise) and at another visit to the VA on June 8, 2010 (spent time watching television, playing computer games and going to the gym to exercise). (AR 1379, 1445.) When he moved to Las Vegas and established with the VA there, he stated that he spent his time watching sports on television, playing poker on the computer, and indicated he planned to go to culinary school. (AR 1844-1845.) These activities (watching television, playing computer games and going to the gym) do

1    not  necessarily translate into the ability to perform in the work place.

2          Notably, when Plaintiff was evaluated in December 2009 by a VA clinical psychologist,

3    Dr. Mosco, related to his mental disorders' impact on any vocational rehabilitation, Dr. Mosco

4    opined that  Plaintiff had social discomfort and a general inability to manage routine daily

5    activities such as daily personal hygiene, grocery shopping, etc. (AR 1632.)

6          For these reasons, the court concludes that the ALJ's reasons for discrediting Plaintiff are

7    not supported by substantial evidence in the record and the ALJ erred in this regard.

8    **D. Medical Opinions**

9          **1. Applicable Law**

10          "'In disability benefits cases ... physicians may render medical, clinical opinions, or they

11    may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'"

12    *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d

13    715, 725 (9th Cir. 1998)). "In conjunction with the relevant regulations, [the courts] have ...

14    developed standards that guide our analysis of an ALJ's weighing of medical evidence.'"

15    *Garrison*, 759 F.3d at 1012 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir.

16    2008)). Courts "'distinguish among the opinions of three types of physicians: (1) those who treat

17    the claimant (treating physicians); (2) those who examine but do not treat the claimant

18    (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

19    physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

20    1995)). "'As a general rule, more weight should be given to the opinion of a treating source than

21    to the opinion of doctors who do not treat the claimant.'" *Id.*; *see also* 20 C.F.R. §

22    404.1527(c)(2). "[T]he opinion of a treating physician is thus entitled to greater weight than that

23    of an examining physician, [and] the opinion of an examining physician is entitled to greater

24    weight than that of a non-examining physician." *Garrison*, 759 F.3d at 102 (citing *Ryan*, 528

25    F.3d at 1198). "'The weight afforded a non-examining physician's testimony depends on the

26    degree to which [he] provide[s] supporting explanations for [his] opinions.'" *Id.*

27          "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion,

28    an ALJ may only reject it by providing specific and legitimate reasons that are supported by

substantial evidence.'" *Id*. "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight ... even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). If an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c)(2)(i)-(ii) and (c)(3)-(6) in determining how much weight to give each opinion. The factors include: length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii) and (c)(3)-(6). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725.) "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id*. (citation omitted).

### 2. ALJ's Findings

The ALJ first discussed Plaintiff's psychological consultative examination with Dr. Lewis on April 3, 2009. (AR 28.) He pointed out that Plaintiff reported his mood had stabilized with medication and ongoing psychiatric treatment, he denied suicidal thoughts, sleep disturbances and feelings of depression or manic episodes. (AR 29.) The ALJ highlighted the following opinions made by Dr. Lewis: Plaintiff has sufficient cognitive ability to understand, remember and carry out uncomplicated detailed and simple one- and two-step instructions as well as complex instructions if given sufficient time; he can maintain attention and concentration for routine tasks. (AR 29.) The ALJ also noted that Dr. Lewis "suggested" Plaintiff could not interact appropriately with supervisors, coworkers and the public because of his irritability, but the ALJ pointed out that Dr. Lewis also stated that based on Plaintiff's work history, he could perform tasks for a short period. (AR 29.) Next, the ALJ cited Dr. Lewis's conclusion that Plaintiff had a GAF score of 50, which only reflects moderate difficulties of functioning. (AR 29.) The ALJ gave Dr. Lewis's opinion "great weight," finding it consistent with the evidence

1    showing that Plaintiff's symptoms were controlled with medication and that he had the ability to

2    perform basic work functions. (AR 29.)

3         Next, the ALJ turned to Plaintiff's July 2009 neuropsychological consultative

4    examination. (AR 29.) The ALJ noted that Plaintiff's results were mostly in the mold to average

5    range and deficits were likely linked to drowsiness. (AR 29.) The examiner assigned Plaintiff a

6    GAF score of 50, which reflected serious symptoms. (AR 29.) The ALJ afforded this opinion

7    "some weight," stating that the record supported the conclusion that drowsiness most likely

8    affected his performance instead of a history of brain injury. (AR 29.) The ALJ did not fully

9    accept the GAF score assessment, finding that the record showed Plaintiff's symptoms did not

10   seriously affect his functioning when he was on medication. (AR 29.)

11        The ALJ then discussed Dr. Drymalski's opinions. (AR 29-30.) The ALJ acknowledged

12   that Dr. Drymalski described Plaintiff as very irritable with a low tolerance for frustration, and

13   with poor abilities understanding, remembering and carrying out detailed instructions and setting

14   realistic goals. (AR 29.) The ALJ noted that Dr. Drymalski "suggested" Plaintiff had poor

15   abilities dealing with the stress or semi-skilled or skilled work, and has trouble getting along with

16   others and staying focused and maintaining concentration. (AR 29.) The ALJ also noted

17   Dr. Drymalski's conclusion that Plaintiff's impairments would likely cause him to be absent from

18   work more than three times a month. (AR 29.) The ALJ gave Dr. Drymalski's opinions "little

19   weight," finding they were inconsistent with the evidence that showed Plaintiff's symptoms are

20   controlled with medication, and that he has the ability to perform basic work activities consistent

21   with unskilled work. (AR 30.) The ALJ also stated that the opinions were "quite conclusive," as

22   Dr. Drymalski gave little to no explanation for her opinion regarding absenteeism. (AR 30.)

23        The ALJ then afforded the RFC assessments by Disability Determination Services

24   "significant weight," finding they were consistent with the objective medical evidence. (AR 30.)

25        **3. Analysis**

26        As was articulated in the court's analysis of the ALJ's findings regarding Plaintiff's

27   credibility, in assigning Dr. Drymalski's opinions "little weight" because Plaintiff's mental health

28   condition was well controlled by medication and that he could perform basic work activities, the

ALJ ignored the complete picture of Plaintiff's mental health, including many of his treatment records. The court will not repeat that analysis here. In addition, the ALJ ignored (either wholly or in part) the opinions of other medical providers.

While the ALJ gave great weight to Dr. Lewis' opinions, he ignored Dr. Lewis's statements regarding Plaintiff's inability to hold a job and his opinion that Plaintiff has poor social skills that would cause supervisors to quickly lose patience with him and that his irritability would impact his ability to interact appropriately with supervisors, coworkers and the public. (AR 1017.)

The ALJ gave "significant weight" to the RFC assessments by Disability Determination Services (AR 30). There are two Disability Determination Services RFC assessments in the record. (AR 1019-1035 and AR 1795-1809.) The first was completed in April 2009 by Dr. Kotler. (AR 1019-1035.) The second was completed in September 2011 by Dr. Richman. (AR 1795-1809.) The ALJ  ignored the ultimate conclusion of Dr. Kotler that while Plaintiff had adequate memory and concentration, he "does not have adequate social skills and would not be able to maintain appropriate interaction with supervisors, coworkers and the public. (AR 1035.)

The RFC assessment completed by Dr. Richman stated that Plaintiff has moderate limitations in memory and concentration, in the ability to work in coordination or proximity to others and to interact with the public and respond appropriately to criticism from supervisors. (AR 1795-1797, 1807.) Dr. Richman nevertheless concluded that Plaintiff could sustain a regular work week. (AR 1797.) Dr. Richman noted that Plaintiff last worked in March of 2008, but the job lasted for only three months before he was fired for yelling at his supervisors and not performing. (AR 1809.) Dr. Richman stated that at the time he had problems with handling anger, but this improved with psychiatric treatment. (AR 1809.) Dr. Richman also noted that Plaintiff's medications were helpful. (AR 1809.) Dr. Richman concluded that the claimant had not alleged any change or worsening of his mental condition since his initial assessment, and therefore Dr. Richman agreed with the prior decision. (AR 1809.) Dr. Richman, like the ALJ, does not acknowledge the first RFC assessment's conclusion regarding Plaintiff's inability to maintain appropriate interaction with supervisors, coworkers and the public.

1    In discussing Plaintiff's July 2009 neuropsychological examination, the ALJ afforded this
2    opinion "some weight," but did not fully accept the GAF score assessed, stating that the record
3    showed Plaintiff's symptoms did not seriously affect his functioning while he was on his
4    medication. (AR 29.) Again, the finding that Plaintiff's mental health condition was well
5    controlled by medication is not supported by substantial evidence in the record. The ALJ did not
6    discuss various other GAF assessments. Dr. Lewis assigned Plaintiff a GAF score of 60. (AR
7    1017.) VA clinical psychologist Dr. Mosco assessed Plaintiff's GAF score as a 41 in December
8    2009. (AR 1624.) On April 16, 2010, VA staff psychologist Dr. Dandrea assessed Plaintiff's
9    GAF score as a 50. (AR 1446.) When he was evaluated at the VA in Las Vegas in July 2011, his
10   GAF score was noted as being between 55 and 60. (AR 1848.) A month later, when he was
11   admitted for treatment for mental health issues, his GAF score was 65. (AR 1859.) These records
12   make clear that Plaintiff's mental health condition, along with his GAF score, were not
13   consistent.

14   The ALJ made no mention of the opinion of a VA staff psychologist who examined
15   Plaintiff in May 2009 that Plaintiff was "unemployable" as a result of his bipolar disorder, stating
16   that he was not able to tolerate increased stressors without significant deterioration of his mood.
17   (AR 903.) The ALJ likewise failed to discuss VA clinical psychologist Dr. Mosco's December
18   2009 opinion that Plaintiff had a general inability to manage routine daily activities.

19   Finally, the ALJ rejected Dr. Drymalski's opinion regarding Plaintiff's absenteeism
20   because she did not give an explanation to support her opinion. The ALJ failed to acknowledge
21   her vast treatment records and that Dr. Drymalski's opinion on absenteeism could be drawn from
22   these records and from Plaintiff's other treatment records. Moreover, the ALJ did not explain
23   why he interpreted Plaintiff's medical records as failing to provide a basis as to absenteeism. *See*
24   *Garrison*, 759 F.3d at 1012 (citation omitted) ("'ALJ must do more than state conclusions. He
25   must set forth his own interpretations and explain why they, rather than the doctors', are
26   correct.'"); *see also Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th Cir. 1988) (ALJ must set forth
27   why his or her interpretation of the evidence is correct and the treating physician's is not).

28   In sum, the court finds the ALJ erred because his decision to assign Dr. Drymalski's

opinions "little weight" was not supported by substantial evidence in the record.

**E. Plaintiff's Witnesses**

Plaintiff includes a brief argument that the ALJ improperly discredited Plaintiff's witnesses, Rita LePine and Shawn Wischmeier.

With respect to Plaintiff's grandmother, Ms. LePine, the ALJ acknowledged her opinion that Plaintiff was unable work. (AR 30.) The ALJ noted, however, that Ms. LePine mentioned that Plaintiff is able to cook, clean, shop, use public transportation, take care of his grooming and hygiene, and manage his own financial affairs. (AR 30.) In addition, she did not answer when she was asked how much time she spends with Plaintiff. (AR 30.) She also mentioned that she did not know how much time it took Plaintiff to prepare his meals and did not know where he went on a regular basis. (AR 30.) The ALJ afforded this opinion "little weight," finding it to be internally inconsistent, and concluded that Ms. LePine did not know enough about Plaintiff's daily functioning to shed new light on the situation. (AR 30.) Finally, the ALJ stated that Ms. LePine is a close relative of Plaintiff and is likely to endorse his application for disability due to this relationship. (AR 30.)

As to Plaintiff's wife, Shawn Wischmeier, the ALJ noted that she reported Plaintiff's mood was unstable, and that he was unable to function on a daily basis without her assistance. (AR 30.) She also said that Plaintiff had sleep disturbances and was placed in a special school program because of his outbursts in class. (AR 30.) The ALJ afforded this opinion "little weight," finding it was inconsistent with the evidence showing that Plaintiff's symptoms were controlled with medication and that he has the ability to perform basic work activities consistent with unskilled work. (AR 30.)

"'Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account.'" *Ghanim v. Colvin*, --- F.3d ---, 2014 WL 4056530, at * 9 (9th Cir. Aug. 18, 2014) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012)). "An ALJ may reject a lay witness's testimony only 'upon giving a reason germane to that witness.'" *Id.* (quoting *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007)).

1    The court finds that the ALJ provided sufficient reasoning for rejecting the opinions of

2    Ms. LePine; however, the ALJ's reason for discrediting the opinions of Plaintiff's wife are not

3    supported by substantial evidence in the record and in that respect he erred.

4    **F. Vocational Expert**

5        **1. Plaintiff's Argument**

6    Plaintiff contends that the ALJ erred in failing to provide the limitations assessed by

7    Dr. Drymalski and Dr. Kotler to the VE. (Doc. # 11 at 14.) Plaintiff points out that one of the

8    jobs identified by the VE is a cashier, which requires constant interaction with the public. (*Id*.)

9    Plaintiff also mentions that the VE testified that if Plaintiff requires ADA accommodations, the

10   jobs identified would be unavailable. (*Id*.) Plaintiff further asserts that the VE testified that if the

11   individual were absent three or more days per month, these jobs would be unavailable. (*Id*.)

12   Additionally, the VE testified that if an individual were significantly slower in pace than an

13   average worker, the cashier and ticket taker jobs would be eliminated. (*Id*.) Finally, Plaintiff

14   notes that the VE testified that in combination with the mental impairments listed by the treating

15   doctor, the jobs of cashier and ticket taker and jobs in a light industrial setting would be very

16   significantly reduced or eliminated. (*Id*. at 15.)

17       **2. Commissioner's Argument**

18   The Commissioner argues that the ALJ did not need to present the VE with the findings

19   of Dr. Drymalski and Dr. Kotler because they were not supported by substantial evidence in the

20   record. (Doc. # 17 at 12.)

21   Insofar as the ADA accommodations are concerned, the Commissioner contends that

22   there is no evidence Plaintiff had any work-related ADA accommodations. (Doc. # 17 at 13.) In

23   addition, the Commissioner argues that the VE only testified an ADA accommodation requiring

24   unscheduled breaks would prevent Plaintiff from performing any job, and the ALJ did not find

25   Plaintiff required unscheduled breaks and rejected Dr. Drymalski's findings about absenteeism.

26   (AR 21-32.)

27   ///

28   ///

- 40 -

1

### 3. VE Testimony

2      The VE answered a variety of questions posed by the ALJ and by Plaintiff's counsel

3  about a hypothetical person's ability to work. First, the ALJ posed the following hypothetical to

4  the VE:

5          Well, I'd like you to assume you had a hypothetical man who was a younger
           individual with the same work history as Mr. Wischmeier; and at least a high
6          school education; and treatment for bipolar disorder, post traumatic stress
           disorder; with a history of myofascial joint pains and bilateral knee pain, and
7          degenerative joint disease of the right foot; treatment for -- well, was status post
           laparoscopic cholecystectomy for cholecystitis with cholelithiasis, treatment for
8          sleep apnea, and -- well, if we were to assume these impairments would limit that
           hypothetical man to light work as defined by the <u>DOT</u> and the regulations; with
9          occasional climbing of stairs or ramps; and no climbing of ladders, ropes, or
           scaffolds; balancing limited to frequent; frequent stooping; occasional kneeling;
10         frequent crouching; occasional crawling; no exposure to extremes of cold, such as
           might be found working in a cold storage facility; no exposure to hazards such as
11         heights or dangerous moving machinery. The work would further be unskilled
           with brief and superficial contact with others in the workplace, to include the
12         public coworkers, and supervisors; and no rapid or frequent changes in work
           routine, such that the work would be repetitive in nature. Any changes would be
13         gradual and infrequent, any changes in routine, that is.

14  (AR 83-84.)

15      The VE testified that this hypothetical individual could not do Plaintiff's past relevant

16  work, because it was either skilled or semi-skilled. (AR 84.) When asked whether there were

17  jobs in the national economy that Plaintiff could do, the VE responded:

18         Well, this is a fairly narrow hypothetical. I mean, we're talking about unskilled
           work, not very many physical demands; superficial, brief contact with the public;
19         mostly repetitive work; no machinery. So, it's fairly limited. The only things I
           could think of, maybe, might be something like either a cashier -- I mean, there's,
20         there's regular contact with the public, continuous contact sometimes, but it's not
           interactive contact. It's superficial and brief. Or maybe like a ticket taker, or
21         maybe like a light assembler in the light industrial setting. Some of the jobs in that
           area would be reduced because he can't be around machinery, but there's some
22         jobs, there aren't that many in number, involved with working with light products
           like optical equipment and electronics, that doesn't involve being around
23         machinery. So, I'd probably limit it to jobs such as those.

24  (AR 84-85.) The electronic assembly job would be sedentary, and there were 100,000 of those

25  jobs in the national economy. (AR 85.) There were 85,000 ticket taker jobs and 2,200,000

26  cashier jobs available in the national economy. (AR 85-86.)

27      The ALJ also asked the VE if this hypothetical man were absent three or more days a

28  month whether he would be competitively employable at these jobs, and the VE responded that

he would not. (AR 86.)

Plaintiff's counsel then asked the VE whether the availability of the jobs described would be impacted if the individual was required to have ADA accommodations, including the ability to take unscheduled breaks to phone someone to recompose himself. (AR 86-87.) The VE responded that his testimony did not take into account accommodations. (AR 87.) He testified that in all of these jobs, attendance and the ability to do the job, including the ability to physically be there, would be important; therefore, this individual could not take more than the normal amount of allotted breaks in an eight-hour day. (AR 87.) In sum, the accommodation for unscheduled breaks would eliminate these jobs. (AR 87.)

Plaintiff's counsel also asked the VE how the availability of the jobs would be impacted by an individual who needed accommodation because he was significantly slower in production and pace than the average worker. (AR 87.) The VE testified that for each of these jobs production and pace is a feature; therefore, this accommodation would interfere with the individual's ability to hold these jobs. (AR 87-88.)

Finally, Plaintiff's counsel asked the VE how the availability of these jobs would be impacted by the following mental limitations:

> [S]eriously limited in the ability to remember worklike procedures, maintain attention for two-hour segments, sustain an ordinary work routine without special supervision, work in the coordination or proximity of others without being unduly distracted, complete a normal workday or workweek without interruption from psychologically-based symptoms. I've already asked you about persistence and pace, so I'll put, accept instructions and respond appropriately to criticism from supervisors. I think the Judge included getting along with coworkers, so I'll leave that one out. And he included responding appropriately to changes in a routine work setting. And if they were seriously impaired in the ability to deal with normal work stress and adhere to the basic standards of neatliness [sic] and cleanliness, or travel in unfamiliar places or use public transportation.

(AR 88.)

The VE responded:

> The, the combination of all these taken in totality would probably affect the ability to do, do the jobs we've mentioned, some not -- some features of what you mentioned not so much as others. The jobs we mentioned are not particularly stressful jobs. They're not particularly challenging. They're more repetitious. So, the attention and the ability to handle stress is not as strong a negative feature about being able to sustain these jobs as other features of your hypothetical, such as proximity of others, because, for example, you're, in most of those jobs, you're working around other people, particularly in a light industrial setting. And if

you're a cashier, you're working with customers on a continuous basis many times. Even though you're not actively involved with them beyond a transaction, you are near others. So, that feature of your hypothetical would be more limiting than others. If you took all these features together completely, then I think that would very significantly reduce the jobs that we've talked about, or eliminate them.

(AR 89.)

**4. Analysis**

"An ALJ may rely on a vocational expert's testimony that is based on a hypothetical that 'contain[s] all of the limitations that the ALJ found credible and supported by substantial evidence in the record.'" *Ghanim v. Colvin*, --- F.3d. ---, 2014 WL 4056530, at * 9 (9th Cir. Aug. 18, 2014) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005)). "However, if an ALJ's hypothetical is based on a [RFC] assessment that does not include some of the claimant's limitations, the [VE]'s testimony 'has no evidentiary value.'" *Id.* (quoting *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1166 (9th Cir. 2008)).

Here, the court has made a finding that the ALJ improperly discounted Dr. Drymalski's findings and the Plaintiff's testimony; therefore, the ALJ's reliance on the VE's testimony that Plaintiff could perform the jobs of cashier, ticket taker and assembly have no evidentiary value.

**V. CONCLUSION**

After carefully reviewing the record as a whole, the district court should find that the ALJ erred in discrediting the testimony of Plaintiff and his wife as well as the opinions of Dr. Drymalski, and in presenting an incomplete hypothetical to the VE. The court must now address whether the case should be remanded to the ALJ for further proceedings or whether it should be remanded to the ALJ for the award of benefits.

"Usually, '[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)). "[C]ourts are empowered to affirm, modify, or reverse a decision by the Commissioner, with *or without* remanding the cause for a rehearing.'" *Id.* (quoting 42 U.S.C. § 405(g)) (emphasis original in opinion). In appropriate cases, the court may remand to the ALJ with instructions to award benefits. *Id.* (citations omitted).

"'[W]here there are no outstanding issues that must be resolved before a proper disability

- 43 -

determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony. Rather, we will ... take that testimony to be established as true.'" *Id.* (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988)). This is known as the "credit-as-true" rule. *Id.* The reasoning for this is:

> Requiring the ALJs to specify any factors discrediting a claimant at the first opportunity helps to improve the performance of the ALJs by discouraging them from reaching a conclusion first, and then attempting to justify it by ignoring competent evidence in the record that suggests an opposite result ... Moreover, it avoids unnecessary duplication in the administrative hearings and reduces the administrative burden caused by requiring multiple proceedings in the same case ... [It also] reduces the delay and uncertainty ... and ensures that deserving claimants will receive benefits as soon as possible ... [I]f grounds for [concluding that a claimant is not disabled] exist, it is both reasonable and desirable to require the ALJ to articulate them in the original decision.

*Id.* at 20 (quoting *Varney*, 859 F.2d at 1398-99). The credit-as-true rule applies equally to medical opinion evidence. *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498 (9th Cir. 1989)).

The Ninth Circuit has developed a three-part standard for the credit-as-true rule to determine whether a case must be remanded to the ALJ with an order to calculate and award benefits:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.* (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th Cir. 2008); *Lingenfelter*, 504 F.3d at 1041; *Orn*, 495 F.3d at 640; *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Smolen*, 80 F.3d at 1292).

This rule, however, provides "some flexibility." *Id.* at 21 (citing *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003)). In describing the nature of this flexibility, the Ninth Circuit recently stated: courts must "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Id.*

1    The court will now address the credit-as-true conditions.

2    The first factor looks at whether the record has been fully developed and whether further

3    administrative proceedings would serve no useful purpose. The court is not permitted to remand

4    the case to allow the ALJ to revisit the medical opinions and claimant testimony that were

5    improperly rejected. *Id*. at 22. As the Ninth Circuit stated, this would essentially allow the ALJ to

6    "have a mulligan." *Id*. This appears to be the only purpose for which the matter would be

7    remanded; therefore, this argument is foreclosed.

8    As to the second factor, as was explained in detail above, the ALJ failed to provide

9    legally sufficient reasons supported by substantial evidence for discrediting the testimony of

10   Plaintiff and his wife and the opinions of Dr. Drymalski. As a consequence, the ALJ's

11   hypothetical posed to the VE was incomplete and did not contain all of Plaintiff's limitations.

12   With respect to the third factor, the court must determine whether the crediting of the

13   evidence would require the ALJ to find Plaintiff disabled on remand. Crediting Dr. Drymalski's

14   opinions would mean accepting her conclusion regarding Plaintiff's likely absenteeism. A

15   question posed to the VE by the ALJ reveals that crediting Dr. Drymalski's opinion on

16   absenteeism would in fact result in a finding of disability on remand. The ALJ specifically asked

17   the VE whether about absenteeism of three or more days a month, and the VE responded that a

18   person with such absenteeism would not be competitively employable in the jobs identified as a

19   result of the ALJ's hypothetical. (AR 86.) The VE was also asked if a hypothetical person would

20   be able to perform these jobs if he was significantly slower in production and pace than the

21   average worker, and the VE testified that production and pace are features of each of these jobs

22   and, therefore, this would interfere with the individual's ability to hold these jobs. (AR 87-88.)

23   As such, Plaintiff satisfies the third prong of the credit-as-true analysis.

24   Concluding that Plaintiff satisfies all three prongs of the credit-as-true analysis, the court

25   must finally consider whether to exercise "flexibility" under *Connett* and *Garrison* and remand

26   for further proceedings. Again, this requires the court to examine the record as a whole and

27   determine whether it creates a serious doubt as to whether Plaintiff is in fact disabled.

28   The court finds that it should not exercise such "flexibility." The one fact that gives the

court pause in this examination is Plaintiff's ability to attend culinary school; however, when viewed in the context of Plaintiff's broader mental health picture, the fact that he is able to attend a course in culinary arts does not necessarily mean that he is able to sustain employment. As the court explained above, culinary school does not likely involve all of the stressors Plaintiff would face in employment that gave him trouble in sustaining a job in the past. Moreover, Plaintiff testified, consistent with his treatment records, that he still "flamed out" several times a day and was required to leave class at least once a day to call his wife in order to calm down. (AR 80.) In addition, the ALJ acknowledged that Plaintiff received various section 504 ADA accommodations for his schooling, including a tutor, extra time on tests and the ability to take extra breaks, so that he could complete the program. He would not receive these accommodations in the work force, which further illustrates the point that his ability to attend culinary school does not translate into employment. Therefore, the court cannot conclude that this fact creates serious doubt as to whether Plaintiff is in fact disabled.

In sum, the court concludes Plaintiff has satisfied the conditions of the credit-as-true rule and a review of the entire record discloses no reason to seriously doubt that he is disabled. Therefore, the matter should be remanded for calculation and award of benefits.

**VI. RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the Commissioner's Cross-Motion for Summary Judgment (Doc. # 18) be **DENIED** and that Plaintiff's Motion for Reversal of the Commissioner's Decision (Doc. # 11) be **GRANTED** and the case be **REMANDED** to the ALJ for the calculation and award of benefits.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of

appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: September 24, 2014

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE